**CENTRAL FREIGHT LINES, INC., et al., Petitioners,**

v.

**The UNITED STATES of America and Interstate Commerce Commission, Respondents.**

**No. 81–4219.**

United States Court of Appeals, Fifth Circuit.*
Unit A

March 11, 1982.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Robert J. Grady, Richard A. Allen, Gen. Counsel, I. C. C., William F. Smith, Atty. Gen., U. S. Dept. of Justice, Margaret G. Halpern, Robert B. Nicholson, Antitrust Div., Washington, D. C., for respondents.

Lawrence A. Winkle, Dallas, Tex., for East Texas Motor Freight Lines, Inc.

Maxwell A. Howell, Washington, D. C., for Alamo Exp., Inc.

William O. Turney, Robert E. Campbell, Washington, D. C., for Roadway Exp., Inc.

Wentworth E. Griffin, Alex M. Lewandowski, Frank W. Taylor, Jr., Kansas City, Mo., for Transcon Lines.

Eugene T. Liipfert, Mark J. Andrews, Washington, D. C., for Consolidated Freightways Corp. of Delaware.

Donald B. Levin, Edward G. Bazelon, Chicago, Ill., for Yellow Freight System, Inc. and T.I.M.E., D.C., Inc.

Kenneth G. Thomas, Lubbock, Tex., for T.I.M.E., D.C., Inc.

Gerald D. Colvin, Jr., Birmingham, Ala., for Ryder Truck Lines, Inc. and Bowman Transp., Inc.

Timothy Mashburn, Joseph H. Hart, Phillip Robinson, Robinson, Felts, Starnes & Latting, a Professional Corp., Austin, Tex., for Central Freight Lines, Inc., Brown Exp., Inc.

Leroy Hallman, Phinney, Hallman, Pulley & Coke, Dallas, Tex., for Southwestern Motor Transport, Inc.

James M. Doherty, Austin, Tex., for Red Arrow Freight Lines, Inc.

Ewell H. Muse, Jr., Timothy Mashburn, Austin, Tex., for Basse Truck Line, Herder Truck Lines, Southwest Transport.

Mike Cotten, Clark, Thomas, Winters & Shapiro, Austin, Tex., for Merchants Fast Motor Lines, Inc.

Before THORNBERRY, REAVLEY and POLITZ, Circuit Judges.

THORNBERRY, Circuit Judge:

This is an action reviewing the decision of the Interstate Commerce Commission in lead docket No. MC–2202 (Sub-No. 568)F, *Roadway Express, Inc., Extension—South Texas,*[1] in which the Commission granted the applications of eight motor carriers for long-haul single-line operating rights into and out of Texas. These applications were protested in the Commission—and are now challenged before this Court—by many of the motor carriers that operate short-haul joint-line services in Texas. For the reasons discussed below, we reject appellants' claims and affirm the Commission's decision.

I. The Facts

In 1978, nine interstate motor carriers filed applications with the Commission seeking authorization under the Motor Carrier Act of 1935, 49 Stat. 543 (1935), to extend their operating rights into the Texas market. Appellants filed appropriate pleadings protesting the applications under 49 C.F.R. § 1100.247 (1980). The Commission then ordered the applications set for oral hearing.

At two prehearing conferences held in April and October 1979, the parties dis-

---

1. Consolidated with Nos. MC–42487 (Sub-No. 882), Consolidated Freightways Corp. of Delaware; MC–29910 (Sub-No. 200), Arkansas-Best Freight System, Inc.; MC–35320 (Sub-No. 157), T.I.M.E.–D.C., Inc.; MC–41432 (Sub-No. 155), East Texas Motor Freight Lines, Inc.; MC– 59680 (Sub-No. 220), Strickland Transportation Co., Inc., succeeded by Wilson Freight System, Inc.; MC–107727 (Sub-No. 29), Alamo Express, Inc.; MC–110325 (Sub-No. 88), Transcon Lines; MC–112713 (Sub-No. 227), Yellow Freight System, Inc.

cussed the hearing rules. The Administrative Law Judge (ALJ) announced that he would employ a hybrid procedure, allowing oral testimony and cross-examination for a certain percentage of the witnesses and then using the Commission's modified procedure for the remainder.[2]

Oral hearings began in November 1979, and consumed five weeks during the winter of 1979–1980 for presentation of the applicants' cases-in-chief. After the applicants had presented 127 witnesses for oral testimony and cross-examination, the ALJ concluded that he had heard a representative sample of the public witness evidence and given the protestants sufficient opportunity for cross-examination. The remaining evidence—the testimony of approximately 1,600 other public witnesses—was considered in verified statement form under the modified procedure.

The applicants' public witnesses, representing a wide variety of businesses, testified that existing joint-line services were unresponsive to their needs; they therefore supported the applicants' supposedly more efficient single-line services. In addition, the applicants' expert witnesses testified that population and industry growth throughout Texas indicated a growing need for additional carrier service.

In July 1980, following the passage of the Motor Carrier Act of 1980, Pub.L.No. 96–296, 94 Stat. 793 (1980), the protestants presented their cases-in-chief. The protestants attempted to show that existing services adequately met the public need and that additional service would create harmful competition.

The ALJ then ordered the submission of post-hearing briefs, advising the parties that the entry criteria of the Motor Carrier Act of 1980 applied and that the briefs should be drafted accordingly. On February 27, 1981, the ALJ served the Initial Decision.[3] This Decision granted all of the applications (except that of bankrupt Strickland Transportation Company). Specifically, the ALJ concluded that, especially in light of the overwhelming public witness support, the applicants' evidence "more than satisfies applicant's burden of showing that the service proposed will serve a useful public purpose, responsive to a public demand or need." Initial Decision at 92.[4] The ALJ also determined that the protestants had failed to show how the proposed service would be contrary to the public interest. *Id.* at 98. Finally, the ALJ found that the proposals were consistent with the goals of the new National Transportation Policy set out in 49 U.S.C. § 10101(a) (1981). *Id.* at 99–100.

The protestants then filed an administrative appeal with a three-member division of the Commission. The division denied the protestants' appeal and adopted the Initial Decision. The division did, however, correct "certain erroneous but harmless statements" in the Initial Decision concerning the application of the new statute and the acceptance of the verified statement evidence. Having exhausted their administrative remedies, the protestants filed this appeal.

2. Under modified procedure, the parties file evidence in written verified statement form. *See* 49 C.F.R. §§ 1100.43–.54 (1980).

3. *Roadway Express, Inc., Extension—South Texas,*—M.C.C.—(1981) (Initial Decision). The ALJ had served the Initial Decision on February 4; however, none of the appellants received it at that time, so he served it again on February 27.

4. In addition to proof that the service proposed will serve a useful public purpose responsive to a public demand or need, the Motor Carrier Act requires proof that the applicants are fit, willing, and able to provide the service. *See* 49 U.S.C. § 10922(b)(1) (1981). In this appeal, the applicants' fitness has generally been conceded—with the exception of a challenge to the fitness of Alamo Express, Inc. We find that challenge to be meritless. Alamo presented a number of exhibits, including an analysis by the J. Henry Schroder Corporation of New York, showing that Alamo would indeed be able to provide the proposed service. The ALJ found this evidence to be persuasive, and we do not disagree.

## II. The Hearing Procedure

█ Initially, appellants claim that the hearing procedure employed by the ALJ denied them due process. We disagree.[5]

█ Appellants' argument assumes that due process requires cross-examination of all witnesses whose testimony was taken in the hearing. Due process, however, "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). Instead, it only "calls for such procedural protections as the particular situation demands." *Id.* The Administrative Procedure Act similarly mandates only "such cross-examination as may be required for a full and true disclosure of the facts." 5 U.S.C. § 556(d) (1977). Cross-examination is thus not an absolute right in administrative cases.

█ The cross-examination allowed here was sufficient. Under *Mathews v. Eldridge*, the process that is due depends on three factors: first, the private interest affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value of additional procedures; and third, the government's interest, including the function involved and the fiscal and administrative burden that the additional procedures would entail. 424 U.S. at 335, 96 S.Ct. at 903, 47 L.Ed.2d 18 (1976). In this case, the private interest lies in the appellants' economic stake in business that may possibly be lost to competition from the applicants' proposed services. While this threatened loss is undoubtedly impor-

tant to appellants, the hardship does not compare with the personal economic losses imposed without a full evidentiary hearing in other cases. *See Mathews v. Eldridge, supra; Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Further, the procedures employed here adequately protected the appellants' interests. The cross-examination of 127 public witnesses rendered minimal the risk of erroneously depriving the appellants' interests. Additional cross-examination would have made little difference. And the burden of cross-examining the remaining 1,600 witnesses would have been tremendous; in fact, it would have multiplied manifold a hearing that was already one of the longest service extension cases on record. Likewise, the administrative and fiscal cost of cross-examining 1,600 witnesses would have been great. Full cross-examination, in other words, would have imposed a burden not justified by any significant improvements in the protection of appellants' interests or in the accuracy of the hearing procedure.

██ More importantly, the cross-examination denied here did not harm appellants, because the written verified statement evidence was not necessary to the ALJ's decision. As both the ALJ and the Commission division found, the testimony of 127 public witnesses "who were subject to cross-examination more than satisfies applicant's burden of showing that the service proposed will serve a useful public purpose, responsive to a public demand or need." This oral testimony alone provides substantial evi-

---

**5.** Before reaching the merits of appellants' claim, we would note that appellants appear to have waived their objections to the hearing procedure. At the October prehearing conference, the ALJ clearly and repeatedly outlined the hybrid oral/modified procedure that he would follow. He then offered to take interlocutory appeals from his procedural determination. Although he did not certify an appeal under 49 C.F.R. § 1100.85 (1980), he apparently was offering to do so. Appellants at least should have explored this possibility. Moreover, appellants did not make known at the time of the ALJ's ruling either their specific

objections to his procedure or their own preferred procedure. *See* 49 C.F.R. § 1100.85 (1980) ("Formal exception to a ruling of an officer at a hearing is unnecessary. It is sufficient that a party, at the time the ruling is made or sought, make known to the officer on the record the action which he desires the officer to take or his objection to the action of the officer and his grounds therefor."). Appellants simply did not give the ALJ a timely opportunity to correct any error, if error there was. Nevertheless, because of the importance of due process guarantees, we will decide the merits of appellants' claim.

dence to support the decision under review. *See* part VII *infra*. And appellants make no showing that the uncross-examined evidence would cause any difference in the decision. Indeed, the ALJ found the cross-examined oral testimony to be representative of all of the evidence, and this Court's reading of the record corroborates his conclusion. The written verified statement evidence simply repeats the substance of the oral testimony.[6] Under these circumstances, the partial denial of cross-examination was harmless. *See generally Ka Fung Chan v. Immigration & Naturalization Service*, 634 F.2d 248, 258 (5th Cir. 1981) ("proof of a denial of due process in an administrative proceeding requires a showing of substantial prejudice").

### III. Which Law Applies?

■ Because Congress enacted the Motor Carrier Act of 1980 in the midst of the proceedings below, there is some confusion over whether to apply this new law or the old Motor Carrier Act of 1935. The ALJ determined that the new law applied, while the Commission division only remarked briefly that the evidence satisfied both the old and new laws. Appellants argue that the old law alone should have been applied. We conclude, however, that on the facts of this case the new law applied.

■ As a general rule, a new statute should apply to "cases pending on the date of its enactment . . . unless manifest injustice would result, or there is a statutory directive or legislative history to the contrary." *Corpus v. Estelle*, 605 F.2d 175, 180 (5th Cir. 1979), *cert. denied*, 445 U.S. 919, 100 S.Ct. 1284, 63 L.Ed.2d 605 (1980) (*citing Bradley v. Richmond School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974)). Under *Bradley*, a finding of manifest injustice depends on three factors: the nature and identity of the parties, the nature of the parties' rights, and the impact of the

change in law on those rights. In this case, the second and third factors reveal that no injustice occurred, primarily because the application of the new law did not unfairly deprive appellants of any legal rights. Appellants had no unconditional right to render their motor carrier services without competition from others, nor had they any vested right to have such competition determined under the old law. They received adequate notice of the new law, since Congress enacted it prior to the presentation of their cases-in-chief and the ALJ instructed them to write their briefs accordingly. And their nature and identity—the first factor under *Bradley*—seems neutral here because applicants and appellants are equally capable in their prosecution of this case. Even if appellants' position as small businesses makes them more deserving of protection, it does not outweigh the second and third factors here. *See Bradley v. Richmond School Board, supra*, 416 U.S. at 716–21, 94 S.Ct. at 2019–21, 40 L.Ed.2d 476 (1974).

Moreover, Congress did not prohibit the new law's application in these circumstances. In passing the new law, Congress found that "legislative and resulting changes should be implemented with the least amount of disruption to the transportation system consistent with the scope of the reforms enacted." Motor Carrier Act of 1980, Pub.L.No.96–296, § 3(a), 94 Stat. 793 (1980). Here, the enacted reforms were implemented without any disruption at all. The applications involved were decided fairly and effectively under the new law, causing no harm in the proceedings and allowing a smooth transition to the transportation system envisioned by Congress in the new law. Indeed, to require the application of the old law here would cause great disruption by forcing the parties and the Commission to begin anew a case that all parties agree could eventually be decided

---

6. Thus, no reversible error arose when the ALJ, after noting that the written evidence was cumulative, relied on that evidence in his Initial Decision. Appellants suffered no harm from the additional evidence; indeed, the Commission corrected the ALJ's reliance on the cumulative evidence and held that the oral testimony alone provided substantial evidence to support the ALJ's decision.

under the new law.[7] Congress did not intend the enactment of the new law to cause such tribulation.

Thus, *Bradley* compels the application of the new law to this case. Appellants argue, however, that the Commission's pending application rule, 45 Fed.Reg. 45,-537–38 (1980), forbids this result. The pending application rule applied the old law to applications pending on July 1, 1980, but allowed an applicant who was eventually denied authority under the old law an opportunity for reconsideration under the new law. As appellants note, the rule has the force of law; nevertheless, this does not necessarily bind the Commission to follow the rule in all cases. "It is always within the discretion of a court or administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it. The action of either in such a case is not reviewable except upon a showing of substantial prejudice to the complaining party." *American Farm Lines v. Black Ball Freight Service,* 397 U.S. 532, 539, 90 S.Ct. 1288, 1292, 25 L.Ed.2d 547 (1970), *citing Sun Oil Co. v. FPC,* 256 F.2d 233 (5th Cir. 1958). The pending application rule is clearly a procedural rule designed for the orderly transaction of business—namely, for the processing of applications while implementing the new law. As the Commission observed in promulgating the pending application rule, "there are many thousands of pending applications on hand, and, during this transitional phase, we want to process those with the least amount of disruption to the industry while adhering to the new directions of the Act." 45 Fed.Reg. 45,537 (1980). The Commission did not promulgate the rule primarily to confer important procedural rights. Additionally, the purpose of the

rule is not violated by applying the new law in this case.

One must recognize the purpose of the Act, and the Congressional findings. The purpose is to reduce unnecessary regulation. The Act recognizes that the previous regulatory structure served to inhibit entry and one of the major goals of the Act is to make entry easier. Additionally, the Act is to be implemented with the least amount of disruption to the industry.

*Id.* (citation omitted). The application of the new law here both reduces unnecessary regulation and creates no disruption. Thus, under these circumstances, the Commission did not abuse its discretion or act arbitrarily by departing from the pending application rule.[8]

This conclusion is not undermined by the recent case of *Watkins Motor Lines, Inc. v. ICC,* 641 F.2d 1183 (5th Cir. 1981). The *Watkins* court held only that "Congress did not intend the Motor Carrier Act of 1980 to apply to matters which, on July 1, 1980, had been decided by the ICC." *Id.* at 1187. Here, of course, the Commission had not decided the case on July 1, 1980. Further, the rationale employed in *Watkins*—the avoidance of disruption while implementing the new law—supports the application of the new law on the facts of this case. *Watkins* correctly applied the old law to cases decided under the old law on July 1, 1980, in order to avoid the disruption of requiring new applications, new opportunities for protest, and new preparation by the Commission. But there is no such disruption to avoid in this case—the protestants presented their cases after the passage of the new law, the parties wrote their briefs under the new law, and the ALJ applied the new law in his Initial Decision. In fact, to require the application of the old law on the facts

---

7. See the discussion below of the Commission's pending application rule, which allows applications denied under the old Act to be reheard under the new Act.

8. Additionally, appellants have made no showing of substantial prejudice from the Commission's failure to follow the pending application rule. When appellants presented their cases in

the hearing below, they had full notice of the passage of the new law. In submitting their briefs, they were instructed that the new law would apply. Finally, the pending application rule itself allows eventual application of the new law. Appellants simply were not harmed by the application of the new law here.

of this case would create the very disruption that *Watkins* sought to avoid.

We therefore hold that the Commission did not err in applying the Motor Carrier Act of 1980 to the instant proceeding.

## IV. Operational Feasibility and Antitrust Matters

■ Appellants argue that the Commission erroneously failed to consider two factors—operational feasibility and antitrust matters—in deciding the instant applications. We find, however, that the Motor Carrier Act of 1980 does not require the Commission to consider these factors.

In the Initial Decision, the ALJ noted that "the Commission does not consider operational feasibility, or lack thereof, to be a valid reason for denying an application." Initial Decision at 93. He drew this conclusion from the Commission decision in Ex Parte No. 55 (Sub-No. 43), *Rules Governing Applications for Operating Authority,*— M.C.C.—(1981), which announced the abandonment of operational feasibility as a significant factor in motor carrier operating authority cases:

> We are aware that the national transportation policies amended by the act provides that energy and economic efficiencies be provided for in our regulation of the industry. Normally, however, operational feasibility will not be a decisive factor in an application proceeding. We arrive at this conclusion for the following reasons.
>
> Giving significant weight to operational feasibility evidence would suggest that we can administratively allocate the productive use of resources better than the marketplace; that we can decide which carrier should transport certain percentages of the available traffic; and whether this will be done at the maximum efficiency. Stated differently, it assumes we can decide whether an applicant will operate exactly as it proposes, what response existing carriers will make (such as to compete more aggressively) and whether our powers of predictions are reliable in the long term. We think that

in most cases these assumptions are unfounded.

> The new act gives recognition to this observation. Congress has now recognized that marketplace competition is a better allocation mechanism. Unless there occur reasons in a specific case for believing that the marketplace will not produce the better results, we should not disturb that process.
>
> \* \* \* \* \* \*
>
> What is most critical, from the administrative point of view, is that deciding cases using operational feasibility as a significant factor in every case results in a blunting of market incentives for existing carriers to reassess the efficiency of their existing operations; it further dulls the cutting edge of competition and its reenforcing tendency to let the most efficient operation rise to the top. In sum, a careful, calculated look at the operating feasibility should only be used as the last resort, where we are suspicious that the marketplace allocation scheme is breaking down.

*Id.* at 27–28.

■ We agree with the Commission's reasoning in Ex Parte No. 55 (Sub-No. 43), especially in light of the new law's purpose to "offer increased opportunities for new carriers to get into the trucking business and for existing carriers to expand their services." H.R.Rep.No.96–1069, 96th Cong., 2d Sess. 3, *reprinted in* [1980] U.S.Code Cong. & Ad.News 2283, 2285. A full analysis of operational feasibility in every case would inhibit this new statutory purpose. In fact, operational feasibility was not a statutory requirement even under the old law. It was announced in a General Policy Statement issued by the Commission on November 15, 1973. *See* 38 Fed.Reg. 32,865 (1973). The Commission, in response to the new statute, has decided to alter this policy. We cannot say that the Commission should not have done so, or that the ALJ erred in complying with the new Commission posi-

tion.[9] We note, though, that the Commission cannot disregard the statutory mandate to consider fuel and economic efficiencies under the National Transportation Policy. *See* 49 U.S.C. § 10922(b)(2)(A) (1980). Of course, these factors will not necessarily be determinative: here, for example, the evidence of fuel inefficiency certainly could not have caused a denial of the applications in the face of such strong evidence supporting them. Nevertheless, the Commission should ordinarily engage in explicit consideration of these factors.[10] Our holding simply allows the Commission not to require operational feasibility as a separate standard or controlling factor.

Similarly, the Commission does not have to conduct an antitrust analysis of applications for motor carrier operating authority. The cases cited by appellants establish only that the Commission must consider the anticompetitive consequences of its actions. *See Denver & R.G.W.R.R. v. United States,* 387 U.S. 485, 87 S.Ct. 1754, 18 L.Ed.2d 905 (1967); *McLean Trucking Co. v. United States,* 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944). Moreover, these cases rely on the more restrictive old law and its National Transportation Policy. The new law and National Transportation Policy, with their emphasis on increased competition, cannot require more than that the Commission consider the effects that granting an application will have on competition in the transportation market. The ALJ did this, and found that "[a] grant of the instant applications will promote in the opinion of this Judge competitive and efficient transportation services to meet the needs of shippers, receivers and consumers affected by the applications." Initial Decision at 99. He also considered the effects of the applicants' proposed services on appellants' existing operations. Again, he found that the impact would not be significantly anticompetitive. This analysis is sufficient under the new law.

## V. Should the Commission Have Granted Fewer Than All of the Applications?

■ In the Initial Decision, the ALJ stated that "it would [be] folly to recommend even a partial denial of any of the applications in this proceeding." Initial Decision at 98. Appellants contend that this was error because, according to appellants, section 10922 of the Motor Carrier Act of 1980, 49 U.S.C. § 10922 (1981), and the National Transportation Policy, 49 U.S.C. § 10101 (1981), compel Commission consideration of whether to grant fewer than all of the applications. In other words, appellants would have us require the Commission, in multiple application cases, to quan-

---

9. Ex Parte No. 55 (Sub-No. 43), which announced the Commission's new policy, applied by its own terms to applications filed on or after February 9, 1981. 45 Fed.Reg. 86, 771, 86, 780 (1980). Appellants claim that since the applications here were filed before this date, the 1973 General Statement of Policy must apply to them. But the 1973 General Statement of Policy was not a binding substantive rule: it was simply an announcement of future policy to aid the Commission's decision-making process under the old Act; moreover, it was construed as an equitable factor weighing in favor of granting an application. *See Melton Truck Lines, Inc. v. ICC,* 635 F.2d 891 (D.C.Cir. 1980); *Timlaph Corp. of Virginia,* 129 M.C.C. 367, 379 (1978); *MDI, Inc., Long Prairie, MN Con. Car. Applic.,* 129 M.C.C. 346, 352–53 (1978). Under these circumstances—when the policy is prospective and leaves the agency and its decisionmakers genuine discretion—the Commission has freedom to depart from the policy. *American Trucking Associations, Inc. v. ICC,* 659 F.2d 452, 462 (5th Cir. 1981); *Pacific Gas & Electric Co. v. FPC,* 506 F.2d 33 (D.C.Cir.1974). This freedom is quite properly exercised here, where Congress has directed the Commission to apply a new standard favoring easier access into trucking markets.

10. The ALJ stated that he did "not consider the evidence presented by the protestants with respect to potential inefficiencies in applicants' proposed operations from a standpoint of fuel economies to be particularly relevant to his ultimate decision." Initial Decision at 94. Yet he then expressed his finding under the National Transportation Policy:

It is difficult to make a definite finding on whether a grant of the applications will allow the most productive use of equipment and energy resources. Clearly, it will allow more efficient use of applicants' equipment and resources; but, on the other hand, may tend to make use of protestants' equipment and facilities less efficient.

*Id.* at 99. This analysis is rather obscure and contradictory, but the record supports the ALJ's final conclusion that the evidence does not compel denial of the applications.

tify the amount of service needed and to dispense it to the corresponding number of applicants.

Initially, we note that appellants' argument, although premised on the statutory requirements, draws a confusing parallel to the judicially created *Ashbacker* doctrine. *See Ashbacker Radio Co. v. FCC*, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945). The *Ashbacker* doctrine requires the Commission, in cases of mutual economic exclusivity, to hear all competing applications together in order to decide which of them should be granted. Thus, "[i]f the grant of one of several applications for a new route does, as a matter of economic necessity, preclude the grant of any other application," the Commission should hear the applications together. *Delta Air Lines, Inc. v. CAB*, 275 F.2d 632, 638 (D.C.Cir.1959). In this common sense manner, each applicant is assured a meaningful hearing on its application.

Appellants conceded at oral argument, though, that they do not rely on the procedural *Ashbacker* doctrine for their substantive claim. Rather, they rely on the statutory requirements for the Commission to further the public interest. As the Commission itself has noted, "[o]nce a need has been proved by any one of several applicants seeking the same authority, or by all of them collectively, the public interest must control the determination as to which shall receive the operating right." *Kroblin Refrigerated Xpress, Inc., Extension—Denison, Iowa*, 96 M.C.C. 233, 238 (1964). The Commission has also established a list of criteria to be considered in making this determination.[11]

But appellants' argument mistakenly assumes that the *Kroblin* method of quantifying the necessary amount of service must apply in all multiple application cases. In reality, the *Kroblin* criteria apply only where "a need is shown for a new service *and more than the necessary number of carriers proffer their services to meet such need.*" *Id.* at 237 (emphasis added). *See Herrin Transportation Company Extension—Atlanta, Georgia*, 114 M.C.C. 571, 601 (1971) (the Commission must decide among competing carriers when, *inter alia*, "there is not, in [the Commission's] opinion, sufficient traffic to sustain all of the additional motor carrier operations here proposed"). Thus, the *Kroblin* substantive criteria are used in situations similar to those requiring use of the *Ashbacker* procedure: in cases of "mutual economic exclusivity," the competing applications must be consolidated according to *Ashbacker*, and the Commission must carefully choose among them according to *Kroblin*. *See Western Gillette, Inc., Extension—Louisiana*, 132 M.C.C. 325, 341–47 (1980). Because appellants' evidence did not show that the instant applications were in any sense mutually exclusive—and the entire record evidence showed that the applicants' services were needed by the present (and growing) shipping public[12]—the Commission did not have to dispense measured quanta of motor carrier services.

In fact, we are not certain that the Commission will have to use the *Kroblin* criteria at all under the more liberal new law.[13] The new law has altered the definition of the public interest so as to favor easier

11. These criteria include "an evaluation of the existing authorities and operations of the considered applicants, the location of their terminal facilities, and the equipment operated by them." *Kroblin Refrigerated Xpress, Inc., Extension—Denison, Iowa, supra,* 96 M.C.C. at 237.

12. Indeed, as we read the record, the ultimate showing of the applicants' proof was that the shipping public needed the additional service of all eight carriers. This showing seems especially strong in light of the Commission policy allowing evidence presented by one applicant to inure to the benefit of all applicants in a consolidated proceeding. *See* Contractors

Transport Corp., Extension—Iron & Steel Arts., 126 M.C.C. 637, 640–41 (1977).

13. For example, in the *Western Gillette* case the Commission applied the *Kroblin* criteria, but observed that "[i]t does not follow, however, that the *Kroblin* criteria must remain fixed and immutable for all future time. We simply do not find this an appropriate case in which to undertake such a reappraisal, since the record is stale and the parties have had no opportunity to address the issues arising under the new act." *Western Gillette, Inc., Extension—Louisiana, supra,* at 347.

entry into shipping markets; it has also placed a clear burden on protestants to defeat such entry once a prima facie showing of need for new services has been made. These factors counsel for a more generous decisionmaking standard in multiple application cases. However, we find only that the Commission did not err under the old standard and that the new law could not require more.

### VI. Findings and Reasons

 We agree with appellants that, in order to pass muster under the "arbitrary and capricious" standard, an administrative agency must "provide an adequate explanation of the basis for the actions which they take." *Pitre Bros. Transfer, Inc. v. United States,* 580 F.2d 140, 144 (5th Cir. 1978), *quoting from Humboldt Express, Inc. v. ICC,* 567 F.2d 1134, 1137 (D.C.Cir. 1977). *See* 5 U.S.C. § 557(c) (1977). "The Commission . . . is required to give reasons for its actions if the protestants raise a material disputed issue or if the existence of a material issue is apparent from the proceedings." *Humboldt Express, Inc. v. ICC, supra,* 567 F.2d at 1139. Of course, numerous material issues are disputed by appellants here. But we find that although the Commission's explication of this case is far from crystalline, it is sufficient to enable the parties and this Court to understand the decision granting the applications. The ALJ thoroughly abstracted and discussed the evidence, explained the applicable legal standards under the new law, and analyzed the evidence in light of those standards. The Commission corrected several errors in the ALJ's opinion and then adopted its conclusions. This reasoning process was not so clouded as to prevent meaningful judicial review. It also answered appellants' arguments concerning the hearing procedure, the applicability of various legal criteria, and the competitive effects of the applicants' proposed services. In short, "we can discern in the Commission's opinion a rational basis for its treatment of the evidence, and the 'arbitrary and capricious' test does not require more." *Bowman*

*Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 290, 95 S.Ct. 438, 444, 42 L.Ed.2d 447 (1974).

### VII. Substantial Evidence

 Finally, after an extensive review of the record, we find that the Commission decision to grant the instant applications is supported by substantial evidence on the record as a whole. "Under the substantial evidence test, the decision need not be supported by the weight of the evidence; the 'possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Watkins Motor Lines, Inc. v. ICC,* 641 F.2d 1183, 1189 (5th Cir. 1981), *quoting from Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). Here, the evidence—even limited to the cross-examined oral testimony—clearly established that the applicants' proposals would serve a useful public purpose, responsive to a public demand or need. In fact, the public witness support for the proposals was little short of overwhelming. Appellants' rebuttal evidence did not demonstrate that the proposals were inconsistent with the public interest, at least not so clearly as to render the Commission's decision unreasonable. Thus, on this record, we find that the Commission has successfully passed the substantial evidence test.

For all of the reasons discussed above, we therefore AFFIRM.