LTV FEDERAL CREDIT UNION,
Plaintiff-Appellant,

v.

UMIC GOVERNMENT SECURITIES,
INC. and Banco De La Nacion Argentina, Defendants-Appellees.

UMIC GOVERNMENT SECURITIES,
INC. and Banco De La Nacion
Argentina, Plaintiffs,

v.

LTV FEDERAL CREDIT UNION,
Defendant.

No. 81–1533.

United States Court of Appeals,
Fifth Circuit.

May 6, 1983.

Jim K. Choate, W.S. Barron, Jr., John P. Lilly, Dallas, Tex., for plaintiff-appellant.

Pettit & Martin, Kerry C. Smith, San Francisco, Cal., Johnson, Swanson & Barbee, Charles R. Haworth, Dallas, Tex., for Banco de la Nacion Argentina.

Martin, Tate, Morrow & Marston, Shepherd D. Tate, W. Thomas Hutton, S. Shepherd Tate, Memphis, Tenn., for UMIC Government Securities, Inc.

Before BROWN, GEE and JOLLY, Circuit Judges.

PER CURIAM:

LTV Federal Credit Union (LTV) filed this diversity case as a declaratory judgment action seeking to sanction its unilateral breach of a Standby Commitment Agreement which it had entered two years earlier with UMIC Government Securities, Inc., (UMIC). UMIC in turn sued LTV for breach of contract and securities fraud, and, after complaint was filed, Banco de la Nacion Argentina (Banco) was joined as a plaintiff with UMIC. The cases were consolidated and tried without a jury. The district judge found LTV liable in damages to UMIC and Banco for breach of contract in the aggregate judgment amount of $1,525,647.91. LTV has filed a timely appeal with this court.

The issues raised in this case are complex, and at first glance, confusing, but the district judge did an admirable job of sorting out and resolving the complexities. The district court's findings are errorless and its conclusions of law comport fully with our conclusions. We therefore adopt Judge Higginbotham's opinion as our opinion on appeal, see *LTV Federal Credit Union v. UMIC Government Securities, Inc.*, 523 F.Supp. 819 (N.D.Tex.1981), with some slight amplification on one issue. This expansion is occasioned by the passage of legislation after the district court's disposition below.

I.

The contract at issue here is a standby commitment entered into by LTV and UMIC on June 26, 1978. In this type of agreement, a standby forward contract, the seller of the standby agrees to purchase a commodity, here Government National Mortgage Association securities (GNMA's), at some time in the future for a set price, in return for a non-refundable fee from the purchaser of the standby. *See SEC v. G. Weeks Securities*, 678 F.2d 649, 652 (6th Cir.1982).

It is only Judge Higginbotham's finding that the standby commitment was not itself a security subject to registration under section 5 of the Securities Act of 1933, 15 U.S.C. 77e, that we address here. Summarizing this issue, the district court noted:

> From whatever definitional perspective the standby commitment is viewed, the economic reality remains unchanged. LTV did not enter into a common venture with UMIC, or rely on UMIC's financial expertise, or place any capital at risk with UMIC. The parties to the standby commitment did no more than make an option contract to deliver a thing, the

value of which is under neither's control. Each took a position on the market in the hope that the market would turn to its advantage and the other's disadvantage. And even if the standby commitment is considered a 'security' then as a 'stock option' in GNMA's, it is no more subject to registration than the underlying GNMA's. UMIC thus did not violate the Securities Act by failing to register the agreement.

*LTV*, 523 F.Supp. at 833.

At first glance it is uncertain that LTV has appealed this particular finding. In its statement of issues, LTV lists as issue number five "whether the LTV standby commitment was an unregistered security" under the Texas Securities Act and the 1933 and 1934 Federal Securities Acts, citing general definitional sections of both the 1933 and 1934 Acts, 15 U.S.C. § 77b and 15 U.S.C. § 78c(a). Its discussion of this issue, however, is devoted almost entirely to the applicability of the Texas Securities Act. Buried within the discussion we do find the following: "It [?] is unregistered and its sale or purchase violated both securities acts. 15 U.S.C. § 77 and 15 U.S.C. § 78." Assuming that this inarticulate statement and the ambiguous "it" refer to the LTV standby commitment (which is not clear in the context), we will address this issue.[1]

### II.

Absent congressional action prior to our decision in this appeal, there would be little need for us to write on this or on any other issue presented in this case. Rather, we would simply utilize our Rule 21, *see* 5th Cir. R.21; *NLRB v. Amalgamated Clothing Workers of America,* 430 F.2d 966 (5th Cir. 1970), to affirm the district court's findings and conclusions of law. On October 13, 1982, however, one month prior to oral argument in this case, the 1933 and 1934 Securities Acts were amended expressly to include, *inter alia,* options on securities within the definition of a "security."

Pub.L. No. 97–303, 96 Stat. 1409 (to be codified at 15 U.S.C. §§ 77b(1), 78c(a)(10), 78i, 78bb(a), 78*lll*(14), 80a–2(a)(18) and –2(a)(36)). This legislation was passed in reaction to a Seventh Circuit case holding that the SEC did not have jurisdiction to regulate options on GNMA securities. *Board of Trade v. Securities and Exchange Commission,* 677 F.2d 1137, 1161 (7th Cir. 1982).

We thus must take into account the Supreme Court's admonition in *Bradley v. Richmond School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974) that:

> A court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary.

*See also, Payne v. Panama Canal Co.,* 607 F.2d 155, 163 (5th Cir.1979); *but see, Cox v. Schweiker,* 684 F.2d 310, 318 (5th Cir.1982) (court will normally presume that a legislative enactment is to apply prospectively absent unequivocal statutory directive mandating retroactive application).

In applying this rule, we are also guided by Justice Marshall's frequently cited opinion in *United States v. Schooner Peggy,* 5 U.S. 103, 110, 1 Cranch 103, 110, 2 L.Ed. 49 (1801), which included:

> It is true that in mere private cases between individuals, a court will and ought to struggle hard against a construction which will, by a retrospective operation affect the rights of parties, . . . .

*See, e.g., City of Great Falls v. United States Department of Labor,* 673 F.2d 1065, 1068 (9th Cir.1982); *Florida Power and Light Co. v. Costle,* 650 F.2d 579, 590 (5th Cir.1981); *Iowa Power and Light Co. v. Burlington Northern, Inc.,* 647 F.2d 796, 805 (8th Cir.1981).

We therefore set out to determine whether the amendments to the securities laws which are in effect at the time we decide this appeal are to be applied retroactively to the June 26, 1978, transaction in question.

---

1. With respect to our consideration, *infra,* of the equities involved in this issue, we do attach some significance to LTV's indifferent treatment of this issue and the lack of any claim of real prejudice resulting from UMIC's failure to register the standby agreement as a security.

*Bradley* requires that we apply the October 1982 Securities Acts amendments to this case unless there is statutory direction or legislative history to the contrary, or unless so doing would result in manifest injustice.

### A.

We first note that the legislation comprising the amendments makes no mention of an effective date, much less of a directive as to the retroactive or prospective nature of the legislation. The slight one-and-one-quarter-page document simply ends with the following notation: "Approved October 13, 1982." Pub.L. No. 97–303, 96 Stat. 1409.

On the other hand, the legislative history of the bill, embodied in a rather lengthy House Energy and Commerce Committee report, is laced with such phrases as "*clarification* of SEC jurisdiction", "long-standing Congressional intent that the SEC has the sole authority to regulate options on all securities, including exempted securities," and "confirm the intent of Congress." H.R. Rep. No. 97–626, 97th Cong., 2d Sess. 2, 8, 9, U.S.Code Cong. & Admin.News 1982, pp. 2780, 2786–87. This clarification terminology is not in itself dispositive of the issue before us. *Sikora v. American Can Co.,* 622 F.2d 1116, 1121 (3d Cir.1980) (repeated references to and legislative history concerning Congress's intent to clarify meaning of statute do not justify inference that amendment was to be retroactive).

The issue faced by the Seventh Circuit in *Board of Trade v. SEC,* and the catalyst for the 1982 Securities Act amendments, was which of two regulatory agencies had the authority to regulate trading in GNMA options, since GNMA's are both commodities and securities. *Board of Trade,* 677 F.2d at 1138. Competing for regulatory authority

were the securities regulatory body, the SEC, and its commodities regulatory counterpart, the Commodity Futures Trading Commission (CFTC). After searching the legislative history of both the Securities Exchange Act of 1934 and the 1974 amendments to the Commodities Exchange Act which broadened the definition of commodities to include "all other goods and articles, except onions [2] ... and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in ...," *Board of Trade,* 677 F.2d at 1142, the court found that the CFTC rather than the SEC had regulatory authority over the proposed off-set options in GNMA's. 677 F.2d at 1138 and 1153.[3]

Further, the court stated explicitly that the proposed exchange-formed off-set GNMA options were not securities. *Board of Trade,* 677 F.2d at 1155. Thus, even though the opinion was limited to the specifically proposed off-set options in GNMA's, congressional reaction to the opinion was to extend SEC jurisdiction over all options.

While the exact form of option in *Board of Trade* is not now before us, the Seventh Circuit's discussion of the legislative history of the two regulatory agencies would indicate that, congressional commentary notwithstanding, it was not clear that an option on an exempt security (GNMA's) was itself a security for purposes of registration prior to the 1982 amendments. *Board of Trade,* 677 F.2d at 1159–61.

Supporting this conclusion is *SEC v. G. Weeks Securities,* 678 F.2d 649 (6th Cir. 1982), which specifically noted that a forward standby commitment, at issue here, was not a security. The reasoning of the Sixth Circuit was:

**2.** That's right, onions.

**3.** The SEC authority to regulate exchange-traded options is found in section 9 of the 1934 Securities Exchange Act, 15 U.S.C. § 78i. That section, however, specifically excludes exempted securities from its provisions. 15 U.S.C. 78i(f). The transaction at issue here is not an exchange-traded option, and it is in fact an option on an exempted security. 15 U.S.C.

§ 78c(a)(12) (exempted securities under 1934 Securities Exchange Act include those which are direct obligations of or obligations guaranteed as to principal or interest by the United States). Thus the SEC's "plenary options authority" under section 9 did not include options on exempted securities prior to the October 1982 amendments.

From a securities law standpoint, the key element in both firm and standby forward contracts is that the only additional risks presented by forward, as opposed to a cash, contract are those of price movement during the executory period. Because prices are determined by competitive market forces, registration of forward contracts could provide no data about the seller which would be relevant to those market risks. The gain or loss stems from the impersonal marketplace alone. It is not the product of a commercial endeavor. Hence, under these circumstances, a forward contract does not meet the law's test of a security subject to registration as "an investment of money in a common enterprise with profits to come solely from the efforts of others." *Weeks,* 678 F.2d at 652, citing *SEC v. W.J. Howey Co.,* 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1945).

Reasoning similar to that in *Weeks* was used by then-District Judge Rubin in equating a commodity futures contract with an option. Judge Rubin found that neither met the *Howey* test for an investment contract, *McCurnin v. Kohlmeyer and Co.,* 340 F.Supp. 1338, 1341 (E.D.La.1972), *aff'd per curiam,* 477 F.2d 113 (5th Cir.1973), a finding approvingly cited in *Moody v. Bache & Co., Inc.,* 570 F.2d 523, 525–26 (5th Cir. 1978).[4]

On the other hand, our research has disclosed no case holding that a standby forward contract in exempt securities, in effect a put option in GNMA's, is itself a security subject to registration under the 1933 Securities Act.

We thus find that the statute provides no guidance as to retroactive or prospective application and that the clarification language used in the committee report, interpreting the intent of previous congresses, does not comport with the reality of the legal uncertainty created by case law, at least as it applies to the transaction at

issue. It cannot be said that options on exempt government securities were considered separate securities for purposes of registration prior to the 1982 amendments. We are accordingly unpersuaded that either the statute itself or the legislative history mandates retroactive application of the October 1982 amendments to the standby forward commitment in question here; but neither, and more importantly under the *Bradley* analysis, does the statute or the legislative history direct that the statute be applied prospectively only.

### B.

This conclusion therefore brings us to an examination of whether the retroactive application of the securities laws' amendments would result in manifest injustice. Pertinent to this analysis are "(a) the nature and identification of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in the law upon those rights." *Bradley,* 416 U.S. at 717, 94 S.Ct. at 2019, 40 L.Ed.2d 476; *Central Freight Lines Inc. v. United States,* 669 F.2d 1063, 1069 (5th Cir.1982).

For purposes of defining when retroactive application might work an injustice, *Bradley* distinguishes routine private litigation between individuals from those cases vindicating rights of great national concern. Applicable to this determination is the ability of the parties adequately to present and protect their respective interests. *Bradley,* 416 U.S. at 718, 94 S.Ct. at 2019. In analyzing the nature of the rights, the issue is whether retroactive application would affect rights of the parties which have matured or become unconditional, a status weighing heavily against retroactivity. *Bradley,* 416 U.S. at 720, 94 S.Ct. at 2020. Finally, in determining the impact of the change on existing rights, the inquiry focuses on whether the new law would impose additional and unforeseeable obligations on the parties. *Bradley,* 416 U.S. at 720–21, 94 S.Ct. at 2020–21.

---

**4.** A later case in this circuit dealt, in part, with the similar question of whether contracts to sell GNMA securities were exempt from the registration requirements of the 1933 Act.

*G.A. Thompson and Co. v. Partridge,* 636 F.2d 945 (5th Cir.1981). The case was decided, however, without reaching this issue. *Partridge,* 636 F.2d at 962–63.

First, the parties to this lawsuit are reasonably sophisticated parties, knowledgeable of financial transactions, who negotiated and entered a single contract. Each had entered similar contracts with other institutions and corporations, and the court below specifically found that each party to the contract understood the contents of the agreement and the method of its operation. There was no fraud involved in either the inducement or the execution of the agreement; the agreement was a legal contract, a purely private transaction between two private parties. Each party to the agreement hoped to profit from a change in the market, and this litigation sprang from LTV's realization that it would not so profit. Each party has been equally capable of prosecuting its respective claims in this court and the court below.

We thus have two private parties who entered a single, private contract and who are now involved in a routine, private lawsuit stemming from a breach of that negotiated contract. From this perspective, clearly distinguishable from *Bradley* and falling within the ambit of *Schooner Peggy,* we have purely private parties seeking personal profit in the private market place.

We are therefore clearly convinced that the case before us meets the first criterion for the *Bradley* exception—purely private parties engaged in a routine lawsuit who are not vindicating any public right or matter of public interest. It only remains to be determined whether *Gulfshore Oil Co. v. Mobil Oil Corp.,* 453 U.S. 473, 101 S.Ct. 2870, 69 L.Ed.2d 784 (1981), changes the conclusion that we have drawn.

*Gulfshore Oil* has been cited for the proposition that the importance of the public concerns-private party dichotomy has been diminished. *See,* e.g., *City of Great Falls v. United States Department of Labor,* 673 F.2d 1065, 1068 (9th Cir.1982). The basis for this view is the Court's retroactive application in *Gulfshore Oil* of a new statute to a private civil suit where there was no issue of national concern and its statement in footnote 16 that "this equitable exception [manifest injustice] does not reach a private civil suit where the change does not extinguish a cause of action but merely requires a retrial on damages before a properly instructed jury." *Gulfshore Oil,* 453 U.S. at 486 n. 16, 101 S.Ct. at 2879 n. 16.

Unlike *Gulfshore Oil,* LTV here seeks, by retroactive application of the statute in question, to negate UMIC's entire cause of action and to escape completely the obligations of the contract that it negotiated and from which it benefitted. In our view these factors serve to distinguish fully the instant situation from that in *Gulfshore Oil.* Concisely, *Gulfshore Oil* does not change our conclusion that an important consideration under the *Bradley* analysis is the private nature and purpose of the parties here.

Second, we turn to the nature of the rights which would be affected by retroactive application of the securities laws' amendments. As with the parties involved, these rights were purely private rights stemming from a privately negotiated contract from which each party hoped to reap personal profit.

These private rights and personal obligations are clearly spelled out in the contract. UMIC was obligated to pay LTV $200,000 in return for the right to sell to LTV $4,000,000 in GNMA securities two years later should UMIC so choose. UMIC paid LTV the standby fee on July 28, 1978, and twenty months later gave LTV written notice that it would deliver the GNMA's on June 22, 1980, pursuant to the standby commitment. LTV, under the contract, was obligated to purchase the GNMA's on June 22, 1980, upon twenty-days notice from UMIC in return for the right to the $200,-000 standby fee.

We thus note that the right which would be affected by retroactive application of the 1982 amendments is UMIC's right to sell the GNMA's to LTV under the contract, a right which fully matured on the date that the contract was entered, June 26, 1978. As *Bradley* noted, "The Court has refused to apply an intervening change to a pending action where it has concluded that to do so would infringe upon or deprive a person of a right that had matured or become uncon-

ditional." *Bradley,* 416 U.S. at 720, 94 S.Ct. at 2020.

Third, with respect to the impact that retroactive application of these amendments would have on these existing rights, to find now that the standby commitment is a security which UMIC was obligated to register would not only be to impose an unanticipated obligation on UMIC, *see Bradley,* 416 U.S. at 720–21, 94 S.Ct. at 2020–21, but to question the enforceability of the agreement itself. The impact could not be more devastating upon UMIC's established and matured rights under the contract.

UMIC negotiated a contract and paid $200,000 for the option to sell the GNMA's in question to LTV. It has fulfilled all of its obligations under the contract. The court below, deciding the case before the amendments were passed, awarded UMIC a $1,500,000 judgment. The retroactive application of the amendments would supposedly reduce that judgment to zero and extinguish every right which UMIC had under the contract. Now to legitimize LTV's breach of the contract by the retroactive application of the October 1982 amendments would be unjustly to enrich LTV while unjustly penalizing UMIC.

On the other hand, the right which LTV here contends that it has lost is the right to have the standby commitment registered. Yet the one circuit which has considered the matter has found that registration of such an agreement would not provide someone in LTV's position with any information relevant to the competitive market forces which determine the price of the contract and thus the risk involved in such an agreement. *See SEC v. G. Weeks Securities,* 678 F.2d 649, 652 (6th Cir.1982). Indeed, as noted *supra* note 1, LTV in its brief to this court failed to claim any real prejudice resulting from UMIC's failure to register the standby agreement as a security.

**5.** We do not intimate here that the registration requirements of the 1933 Securities Act are meritless. On the contrary, they play an important role in the protection of investors and potential investors in securities. Under the circumstances of this case, however, where we

Thus retroactive application of the 1982 amendments under these circumstances would give LTV a seemingly insubstantial right[5] while subjecting UMIC to unforeseen, disastrous consequences which it could, and undoubtedly would, have avoided had this obligation been apparent. *Cf. Bradley,* 416 U.S. at 721, 94 S.Ct. at 2021.

Finally we note that the manifest injustice rule is an "equitable exception" to *Bradley's* retroactive application presumption. *Gulfshore Oil,* 453 U.S. at 486 n. 16, 101 S.Ct. at 2879 n. 16. The basis of this litigation is a common, routine cause of action—breach of contract. Two years into the contract and five days before LTV was to purchase the GNMA's, LTV, having decided that it had made a bad bargain, notified UMIC that it would not live up to its part of the agreement—it would not take delivery of or pay for the GNMA securities. Two days after it was to have accepted the GNMA's under the contract, LTV came into federal court armed with a fistful of arguments to justify its contention that the contract was not enforceable. The court below found no fraud involved in the undertaking; rather the contract, which LTV had breached, was an arm's-length transaction between two relatively sophisticated organizations. For all of the reasons stated previously, it is clear that all equitable considerations are on the side of UMIC.

This consideration merely reaffirms our conviction that this case is an exception to the general rule stated in *Bradley* that intervening statutes or case law are to be applied retroactively. Thus, respectful of Justice Marshall's admonition in *Schooner Peggy,* we decline to apply the amendments retroactively to the June 28, 1978, contract between these two private parties. We therefore affirm the district court's holding on this issue, and on all other issues.

AFFIRMED.

are called upon to determine the equity of applying a new law retroactively to the parties in this suit, we must balance the rights that will be obtained by retroactive application against the obligations that will be imposed.