# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-CC-02599-SCT

*THE PUBLIC EMPLOYEES' RETIREMENT SYSTEM*

*v.*

*ANNIE L. STAMPS*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/8/2003 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | MARY MARGARET BOWERS |
| ATTORNEY FOR APPELLEE: | GEORGE S. LUTER |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | ON DIRECT APPEAL: REVERSED AND RENDERED; ON CROSS-APPEAL: AFFIRMED - 01/20/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, CHIEF JUSTICE, FOR THE COURT:**

¶1. The Public Employees' Retirement System [hereinafter PERS] appeals from an order entered by the Circuit Court of the First Judicial District of Hinds County, Mississippi, reversing the order of the Board of Trustees of the Public Employees' Retirement System [hereinafter PERS Board] which denied Annie L. Stamps's claim for disability benefits. Stamps then appealed to the circuit court and was granted relief. PERS appeals, seeking this Court's review of the opinion and order of the circuit court and Stamps cross-appeals..

## FACTS AND PROCEEDINGS BELOW

¶2.     Annie Stamps was employed by Jackson Public Schools as a teacher for twenty-seven and three-fourths (27 and 3/4ths) years, before ending her career in December 1999. Stamps taught kindergarten for the past five years and had also taught the 4th and 6th grade. Stamps was eligible for service retirement which, at the time of the hearing, the maximum benefit was in the amount of $1,850.82 per month. The maximum disability benefit, at the time of the hearing, was $2,600.34 per month.

¶3.     On December 21, 1999, Stamps developed pain in her neck and sought medical attention from her internist, Dr. John Pieklik. She then saw Dr. Carl Hunt, a chiropractor, on several occasions due to her neck pain, and returned to Dr. Pieklik, who suggested she have a MRI performed. On January 11, 2000, Stamps's MRI revealed a central disc protrusion at C2-3. Stamps was then referred, by Dr. Hunt, to Dr. Andre Solomon, who on January 18, 2000, wrote and reported to Dr. Hunt that Stamps suffered an unusual large herniated disc at C2-3 extending down the back of the C3 vertebra, that was also impressing upon the spinal cord. Dr. Solomon also reported that Stamps also had a small ruptured disc or spondylosis at C6-7. He further recommended a myelography and then a surgical corpectomy to remove the disc and also a fusion with plates and screws for stability of the L2-3 joint.

¶4.     Dr. Solomon alluded to the fact that the cause of Stamps's injury is unknown. He noted in his letter to Dr. Hunt that Stamps had an automobile wreck in the 1970's, in which she was "propelled from the front seat to the rear seat and could have injured her neck but she remembers low back pain." He then states that all of the sudden, during the last week of December, she developed neck pain, rigidity, and difficulty in movement. He further noted,

2

however, that "[s]he has been improved by chiropractic manipulation, yet problems still exist." He explained that she is at a definite risk "if her neck assumes certain positions as this may cause further damage to her spinal cord. She is mildly myelopathic and accordingly that can worsen to the point of spasticity and/or paralysis." Dr. Solomon recommended that "she should undergo first a myelogram to determine exactly the nature of the lesion and the stability of the L2-3 joint and secondly it is almost certain that she will have to undergo a corpectomy at C3 to remove this disc...." Basically, Stamps was diagnosed by Dr. Solomon as having a large central herniated disc at the C2-3 level that was compressing and flattening the thecal sac and cord. Dr. Solomon noted that the small ruptured disc, or "at least some spondylosis....[a]t this point and time is inconsequential..."

¶5. On January 20, 2000, Stamps underwent the recommended myelogram, performed by Dr. Steve Crawford, which confirmed the earlier diagnosis of Dr. Solomon. Then, on January 25, 2000, Dr. Winston Capel (a colleague of Dr. Solomon's), a Jackson neurosurgeon, wrote a consultative report in which he recommended a C3 corpectomy with C2-3 and C3-4 discectomies without graft reconstruction and anterior plating at C3-4. He further reported that Stamps had a risk of junctional disease since she already had a borderline stenotic canal distally as well as degenerative changes. On January 28, 2000, Stamps underwent the recommended surgery by Dr. Capel at Central Mississippi Medical Center. It should be noted that, following this procedure, there is an expected decrease in range of motion in the neck . When Stamps was discharged from the hospital on January 31, 2000, Dr. Capel's only post-operative instructions were for her to wear a neck brace and not engage in any contact sports.

¶6.    Stamps had an uneventful postoperative course and was subsequently released by Dr. Capel in July 2000.    Stamps did not make any complaints of exceptional pain to her neurosurgeon.  For example, ten days after surgery, Stamps is noted as "doing well."  Similarly, six weeks after surgery, Stamps only complained of "minimal arm pain" and stated she was no longer taking the narcotic medications that were prescribed to her.

¶7.    On April 21, 2000, Stamps returned to Dr. Pieklik, her treating internist, for follow-up care after surgery.  Dr. Pieklik noted that Stamps had "had a prolonged recovery from her spine fusion.  Seems to have a good attitude.  She is on no medications."  He then noted that he wanted to see her again in three months.  On June 2, 2000, Stamps underwent a Surgical Spine Ap Lat which was ordered by Dr. Capel for follow up purposes regarding the fusion or corpectomy.   The radiology report revealed that osteophyte formation was detected involving C6/C7 and to a lesser degree involving C5/C6 and C4/C5.  The report further stated that no subluxations, or abnormal movements of one of the bones that compromise a joint, were detected.   However, the report specifically stated that Stamps had "post operative changes and cervical spondylosis."   According to Dr. Capel's records and notes, there were no future physical   restrictions imposed upon Stamps.   Also, in her testimony before the Disability Appeals Committee,  Stamps admitted that the only restriction Dr. Capel gave her verbally was "no contact sports" (as mentioned previously), and she further testified that although Dr. Capel said she could return to work, she in fact, did not.

¶8.    Stamps returned to Dr. Pieklik on July 31, 2000, and he stated that "[h]er main problem is the fact that she had a cervical fusion six months ago and is due to see Dr. Solomon, I believe, her neurosurgeon, towards the end of August.  There will be consideration given to her

4

returning to work as a kindergarten teacher. She enjoys a relatively decreased range of motion." It was also noted that she "is having intermittent neck pain; she describes it as more like a tightness."

¶9. On August 8, 2000, Stamps applied for PERS disability and indicated that she stopped work on December 20, 1999. The following month, on September 8, 2000, PERS received a "PERS Statement of Examining Physician" from Stamps's chiropractor Dr. Carl Hunt, who stated that she suffered from the following:

> The patient has degenerative arthritis in the cervical spine with a post-surgical disc rupture and a lower cervical disc rupture that has not been surgically treated. There is a gross loss of range of motion in the cervical spine, and the cervical spine is weak and unstable. The surgery worked well in reducing the intense pain in the neck and arm, however, the degenerative change (including the disc rupture) has this patient unable to resume work activity.

Dr. Hunt's diagnosis was that the post-surgical cervical disc rupture was severe, yet Stamps's prognosis was fair. He also stated that the cervical disc rupture (non-surgery) was moderate and her prognosis was again, fair. He did recommend that she consult a M.D. about her diabetes. It should be noted, however, that an MRI of Stamps's cervical spine in March 2001 indicated "status post anterior fusion from C2 to C4. Congenitally narrow canal with associated *early* degenerative disk disease at C4-5, C5-6, and C6-7 with an associated small left paracentral C5-6 protrusion." This last MRI of the lower back area comports with the records of the neurosurgeons, Dr. Solomon and Dr. Cappel, showing this to be "inconsequential" at this time.

¶10. On October 25, 2000, Stamps received a letter from PERS that the Medical Staff of the Board of Trustees was requesting her to schedule a Functional Capacity Evaluation

5

[hereinafter FCE]. Stamps reported for the exam as scheduled on November 14, 2000 at 8:30 a.m. at the Mississippi Methodist Rehabilitation Center. The referring physician was Dr. David Collipp and the exam was conducted by Lisa Poe, OTR/L. Poe's report stated, regarding Stamps's level of cooperation, that "the client demonstrated cooperative behavior; however, she was self-limited with complaints of pain in all weighted capacities." The report also stated "[i]t is felt that the patient is capable of much more than she demonstrated; however, she was self-limited with complaints of pain with most of these test items. True physical abilities are difficult to determine at this time as the patient is self-limited at a light level of work."

¶11. On December 20, 2000, Stamps underwent a CT scan which was ordered by Dr. Louis Saddler, a Canton internist. This scan revealed the fusion at C2-C3-C4, degenerative disc disease at C5-C6 and C-6-C7, and anterior bone spurring at C5-C6 and C6-C7.

¶12. On January 8, 2001, Stamps was informed by Frank Ready, the PERS Executive Director, of the Medical Board's claims decision.[1] Ready stated that after a careful examination by the PERS Medical Board, it was determined that there was insufficient evidence to support her claim of inability to perform her duties as a teacher due to her medical condition.

¶13. Stamps timely appealed to the PERS Disability Appeals Committee on February 20, 2001. Just two days later, she was notified by the Social Security Administration that she had been approved for disability payments with a disability onset date of December 1, 2001.

---

[1] At the time Stamps's case was reviewed, the member of the Medical Board were: Dr. David Richardson, Dr. Mack Addison, and Dr. David Collipp.

¶14. Towards the end of February, Stamps went to see Jackson neurosurgeon Dr. Adam Lewis for a post-operative check-up. She stated during her Disability Appeals Committee hearing that although Dr. Capel told her to come back in one year to "double-check and see if the hardware was still there," she went to see Dr. Lewis, a Jackson neurosurgeon, instead. On February 28, 2001, Dr. Lewis wrote Dr. Tennin and said that Stamps "continues to complain of headaches and limited range of motion of the cervical spine." He also said that flexion and extension were also significantly limited due to spasm. He did say, however, that the cervical spine x-rays, performed after completion of surgery, "show good alignment of the cervical spine and good position of the bone graft and cervical plate." He said he prescribed her Skelaxin to alleviate the muscle spasms and if the symptoms were not significantly relieved, an MRI of the cervical spine would be in order.

¶15. On March 15, 2001, Stamps underwent the MRI of her cervical spine. The results reported by Dr. Lewis noted that there was disc desiccation at the C4-5, C5-6, and C6-7 levels. No compression of the spinal cord was noted at any of these locations. The report also stated that there were minimal posterior osteophytes, that again, did not compress the spinal cord. At the C5-6 level, there was a small left paracentral protrusion. Finally, Dr. Lewis stated that the spinal canal was congenitally narrow. Dr. Lewis attributed the limited range of motion to spasm and recommended physical therapy and Skelaxin. It appeared to be a relatively typical checkup. Stamps did not complain of any exceptional pain, and Dr. Lewis noted nothing serious. Further, Dr. Lewis did not place any physical restrictions on her. During her testimony at the hearing and in response to whether or not he gave her any restrictions, Stamps

stated, "he just basically told me to rest ... I guess to stay the same as I was doing, the restrictions I had, I guess."

¶16.    On July 5, 2001, Dr. Tennin completed the PERS "Statement of Examining Physician." He reported that her principal diagnosis was cervical myelopathy and her secondary diagnoses were Type II Diabetes and moderate depression.   He said her condition was "expected to deteriorate over time."   He also said that at the time, she had a 0% range of motion of the cervical spine, and her permanent partial impairment rating was 25%.   She was restricted to prolonged standing, sitting less than two hours, lifting less than five pounds, driving, and pushing or pulling.

¶17.    On August 6, 2001, Stamps was afforded a hearing before the Disability Appeals Committee.   The committee members were Drs. David Duddleston and Mary Meeks, with Attorney General employee Anita Clinton Craig as the Hearing Officer.   Several employees of the Jackson Public School District accompanied Stamps to the hearing.   Dr. Michelle King, the principal at Watkins Elementary School, knew Stamps from 1996-1999.   During this time, Dr. King was the Assistant Principal at Raines Elementary School and Stamps taught kindergarten.   Dr. King, along with Gerilyn Thomas, a retired school principal, Sharon Applewhite, an assistant teacher who worked with Stamps, and Gail Jusseley, who taught in the same classroom as Stamps, all testified that Stamps was an excellent teacher.   More importantly, none of Stamps'ss witnesses could testify about her ability to fulfill her duties as a teacher either before or after her diagnosis or surgery because she never returned to work. Interestingly, Dr. King stated that Stamps could be moved to any other classroom within her certification.  In other words, Stamps was not restricted to *only* teaching kindergarten.

8

¶18.   At the hearing, Stamps testified that she was a kindergarten teacher, but could not teach anymore because she could no longer stoop or bend, was restricted in her movements, was in pain, and at the time of the hearing, was "not very focused it seems sometimes and my concentration.  I can't do the job I was doing because I'm in pain...I can't do what kindergarten–or what teaching requires me to do."  She blamed her lack of concentration on all the medication she was taking.  At the time of the hearing, she was taking Ultram, Skelaxin, Lorazepam, Tylenol Arthritis, and occasionally Remeron.  She said she takes the Ultram generally, two to three times a day or every six hours.  She said that "when I'm at home I try to do something to help me or just relax or lay most of my day."  She also denied having ever been to a pain specialist.

¶19.   Upon observation by the Committee of Stamps's ability to move her neck and head in at least a 45 to 50 degree angel from side to side and her ability to look down to read documents, Stamps was asked to explain how this hindered her teaching.  She testified that she was responsible for children on the playground and in the cafeteria.  She further stated that although she had not been offered another job, she had not asked for one either.  She said that even if she had been offered a fifth grade job, she might still have to physically intervene with larger students, and she was unable to do this.  Stamps also testified that she continued to drive, but only for short distances and only if someone is with her because she cannot turn her neck easily.  She stated that she does no housework and only light cooking.

¶20.   The Disability Appeals Committee, in a very thorough recommendation presented to the Board of Trustees, after going through the medical information submitted into the record and listening to testimony, determined as follows:

The Committee recognizes that with a neck fusion the patient does have limitation of movement of the neck; however, Ms. Stamps moved her neck frequently and gesticulated with her head during the hearing, demonstrating a range of movement from 45 to 50 degrees laterally without signs of pain. She was able to get in and out of the chair without difficulty. She had no trouble reading from her seated position and her grooming, including her hair, was very good. Ms. Stamps testified that her pain level was 8 out of 10, but she did not appear to be in this extreme pain at any time during the hearing. Ms. Stamps testified that she sees Dr. Tennin for treatment of residual pain in her neck. The records, however, show that she has seen Dr. Tennin seldom for pain. Only two out of a total of four appointments with Dr. Tennin contained in the record, did she complain of neck and/or cervical pain. On November 18, 2001, she was concerned about her menstrual cycle. On July 9, 2001, she complained of headache and restlessness and the possibility of colon cancer. Ms. Stamps has not sought and Dr. Tennin has not offered referral to a pain specialist. Ms. Stamps did not complain of exceptional pain to the neurosurgeons who treated her and has not been sent back to them for pain. Finally, two separate therapists noted that Ms. Stamps demonstrated inappropriate pain behavior and low pain tolerance.

There is no doubt that Ms. Stamps suffered from a cervical spine disease at C2-4 now status post cervical vertebral resection and fusion of the neck as noted above and this has resulted in some loss of mobility of the neck. This should not, however, present any limitations for her job or restriction of her job duties. There is no evidence that this operation was unsuccessful. The latest MRI of the lower spine shows early evidence of degenerative disease but this is not considered by the neurosurgeons to be debilitating at this time. Ms. Stamps' [sic] credibility as to the level of pain she experiences is belied both by her demeanor, her medical records, and her history of complaints.

In sum, the Disability Appeals Committee, having reviewed the record, including additional documents submitted at the hearing, concludes there is not sufficient objective medical evidence in the record to show that Ms. Stamps is unable to perform the functions at her job or to support her claim of permanent disability. The Disability Appeals Committee, therefore, recommends that the final administrative decision of the PERS Medical Board denying disability retirement benefits be affirmed.

¶21. The question before the PERS Medical Board, the Disability Appeals Committee, and the PERS Board of Trustees was whether Stamps'ss claim met the statutory requirements for the receipt of a disability benefit. The Disability Appeals Committee made its recommendation

to the PERS Board of Trustees. The PERS Board of Trustees agreed with the Disability Appeals Committee's findings and subsequently, on August 28, 2001, denied disability benefits. Stamps filed an appeal in the Circuit Court of the First Judicial District of Hinds County. The question before the circuit court was whether the decision of the Board of Trustees is supported by substantial evidence, is neither arbitrary nor capricious, and does not violate Stamps's constitutional rights. On September 9, 2003, the circuit court entered its opinion and order reversing the Board's decision based on the determination that the decision of the Board was not supported by substantial evidence. Accordingly, PERS appealed and the case is now before this Court.

**DISCUSSION**

¶22.    PERS was established in 1953 to provide retirement and other benefits to covered employees of the state, its political subdivisions, and instrumentalities.    Chapter 299, Mississippi Laws of 1952.

¶23.    In addition to service retirement benefits, disability benefits are provided for members who meet the statutory requirements for such benefits.    The two categories of disability benefits available to PERS members are: (1)    a regular disability benefit payable to members who have at least four (4) years of creditable service and who become disabled for any reason, and (2) a hurt-on-the-job disability benefit, payable to members regardless of the number of years of creditable service, where the member becomes disabled due to an injury occurring in the line of duty.  Miss. Code Ann. § 25-11-113 & 114 (Rev. 2003).

¶24.    Applications for disability benefits are reviewed by the PERS Medical Board which arranges and passes upon all medical examinations for disability purposes and reports its conclusions and recommendations to the PERS Board of Trustees.  Miss. Code Ann. § 25-11-119 (Rev. 2003).   Any person aggrieved by a determination of the PERS Medical Board may request a hearing before the designated hearing officer of the PERS Board of Trustees.

¶25.    The Medical Board initially makes a determination as to whether an individual is permanently disabled as that term is defined under PERS law as follows:

> the inability to perform the usual duties of employment or the incapacity to perform such lesser duties, if any, as the employer, in its discretion, may assign without material reduction in compensation or the incapacity to perform the duties of any employment covered by the Public Employees' Retirement System (§ 25-11-101 et seq.) that is actually offered and is within the same general territorial work area, without material reduction in compensation.

Section 25-11-113 further provides that:

> in no event shall the disability retirement allowance commence before the termination of state service, provided that the medical board, after a medical examination, shall certify that the member is mentally or physically incapacitated for the further performance of duty, that such incapacity is likely to be permanent, and that member should be retired . . .

## Standard of Review

¶26.     Rule 5.03 of the Uniform Rules Circuit and County Court Practice sets forth the standard of review by the circuit court on matters appealed from an administrative body such as PERS.   "This Court's standard of review of an administrative agency's findings and decisions is well established." *Byrd v. Pub. Employees' Ret. Sys.*, 774 So. 2d 434, 437 (Miss. 2000). "An agency's conclusions must remain undisturbed unless the agency's order 1) is not supported by substantial evidence, 2) is arbitrary or capricious, 3) is beyond the scope or power granted to the agency, or 4) violates one's constitutional rights." *Id.* (citing *Sprouse v. Miss. Employment Sec. Comm'n*, 639 So. 2d 901, 902 (Miss. 1994)).  *Freeman v. Pub. Employees' Ret. Sys.*,  822 So. 2d 274, 278 (Miss. 2002).

¶27.     Further, a reviewing court may not substitute its judgment for that of the agency rendering the decision and may not re-weigh the facts.  *Pub. Employees' Ret. Sys. v. Dishmon*, 797 So. 2d 888, 891 (Miss. 2001).

### I.     On Direct Appeal– Did the Circuit Court Err By Reversing the PERS Decision to Deny Stamps Disability Benefits?

¶28.     We conclude that the circuit court did, in fact, err by reversing the PERS decision to deny Stamps disability benefits because the PERS decision was supported by substantial evidence, was not arbitrary and capricious, was made within the scope or power granted to

13

PERS, and did not violate Stamps's constitutional rights. *Sprouse*, 639 So. 2d at 902 (Miss. 1994). Accordingly, in *Mississippi State Board of Accountancy v. Gray*, 674 So. 2d 1251, 1257 (Miss. 1996), this Court held:

> A reviewing court cannot substitute its judgment for that of the agency or re-weigh the facts of the case. Chancery and Circuit Courts are held to the same standard as this Court when reviewing agency decisions. When we find the lower court has exceeded its authority in overturning an agency decision we will reverse and reinstate the decision.

¶29. In order to qualify for a disability benefit under PERS law, Stamps was required to prove that the conditions upon which she bases her claim are disabling and that the disability was the direct cause of her withdrawal from state service. Stamps, as a claimant, "has the burden of proving to the medical board and to the Appeals Committee that she is in fact disabled," in an initial application for disability benefits. *Dishmon*, 797 So. 2d at 893. "There is a rebuttable presumption in favor of the action of an administrative agency and the burden of proof is on the one challenging its action" (quoting *Fulce v. Pub. Employees' Ret. Sys.*, 759 So. 2d 401, 404 (Miss. 2000)). *Freeman*, 822 So. 2d 274, 280 (Miss. 2002). Stamps did not meet her burden because although she may have needed her surgery, she is clearly *able* but *unwilling* to return to her job as a teacher. Her condition, at this time is not debilitating.

¶30. The record clearly supports the Order of the PERS Board of Trustees, which took into consideration all of the medical evidence offered by Stamps. Although the circuit court stated that it conducted an "objective" review of the record, we disagree. The circuit court, like the Committee, noted that Stamps suffered a central disc protrusion at C2-3 and also has disc disease at the C5-6. However, unlike the circuit court, the Committee realized that following surgery, there is "an expected decrease in range of motion in the neck." The Committee noted

14

that the loss of some mobility in her neck and surgery she underwent would not "present any limitations for her job or restriction of her job duties." Quite simply, as confirmed by the following examples, the medical evidence does not establish that Stamps's ailments are disabling. Unlike Stamps's contention, she is capable of performing her work duties from a medical standpoint. Therefore, she is not entitled to disability benefits from the State of Mississippi.

¶31. The circuit court relied only on the subjective comments of Stamps, instead of pointing to the objective evidence in the file to support a claim of disability. In its opinion, the circuit court reflected on the testimony offered by Stamps as to the conditions she suffered from as well as the pain she experiences. The circuit court noted that Stamps has been to several physicians as well as a chiropractor, Dr. Hunt, but Dr. Hunt is the only one who stated Stamps was disabled. The circuit court also discussed the fact that Stamps underwent an FCE, yet it neglected to comment on the results of the FCE. The circuit court also did not reference any of the reports of the neurosurgeons who treated Stamps. Again, this Court has held that the weight given to the statements of a personal physician is determined by PERS, and it is not for the courts to re-weigh the facts. *Dishmon*, 797 So. 2d at 888.

¶32. The Committee, in its finding of fact, noted that Dr. Tennin placed several restrictions on Stamps. However, it was noted that the employer's statement of job requirements did not include any of the activities restricted *other than standing*. It was further noted that one of the witnesses from the school district testified that the position did not require prolonged standing. Also, Stamps did not return to the classroom after the Christmas holidays, and thus, the witnesses from the school did not actually see her attempt to perform her job duties after

15

she allegedly became too ill to work. Again, it is the duty of PERS to determine which reports garner more weight than others. **Byrd**, 774 So. 2d at 438. This is exactly what the Committee did in its findings of fact.

¶33. Stamps's testimony is refuted by the medical documentation in the record. For example, she testified that she "was told I had full blown arthritis." She then went on to testify that she did not recall any restrictions placed on her by her neurosurgeon (because there were none). Later in her testimony, she stated that Dr. Cappel told her not to engage in any contact sports. Again, she testified that Dr. Cappel told her that she has "full blown arthritis in" her neck. However, there are no medical records that support her statements regarding her having "full blown arthritis." She then said that after she went to see Dr. Lewis, he told her not to make any changes.

¶34. The circuit court also noted that Stamps had been approved for the receipt of disability benefits by the Social Security Administration. As this Court noted in **Doyle v. Pub. Employees' Ret. Sys.**, 808 So. 2d 902, 907 (Miss. 2002), "PERS is not bound by any finding of the Social Security Administration."

¶35. Clearly, the Disability Appeals Committee premised its recommendation on the medical evidence in the record. On the other hand, the circuit court failed to explain how the recommendation of the Committee was not supported by substantial evidence. We conclude that, the PERS decision is supported by substantial evidence and is thereby neither arbitrary nor capricious. The circuit court impermissibly reweighed the evidence in this matter and substituted its judgment for that of the administrative agency. Therefore, the order of the Board of Trustees should be reinstated and the decision of the circuit court reversed.

16

**II. On Cross Appeal-- Alternatively, Should Stamps's Case Should Be Reversed and Remanded for a New Hearing Because She Was Referred by Medical Board Member Dr. David Collipp to the Mississippi Rehabilitation Center, Where He Is a Medical Director, for a Functional Capacity Evaluation in Violation of the Mississippi Ethics in Government Law?**

¶36. Review in cases such as this are limited in scope as set forth in the PERS primary brief. Stamps alleges that Dr. Collipps's referral violated the Ethics in Government Law. Further, Stamps alleges that a due process conflict of interest exists because Dr. Collipp referred her to a clinic where he is a "director." Even if the allegations were true, it does not fall under one of the three criteria set forth in Rule 5.03 of the Uniform Rules of Circuit and County Court Practice, and it would not have violated a statutory or constitutional right of Stamps.

¶37. Furthermore, according to Miss. Code Ann. § 25-11-119, Dr. Collipp was acting according to his statutory duties as a member of the Medical Board. Section 25-11-119 states in part " [t]he medical board . . . shall *arrange for*, and *pass upon*, all medical examinations required under the provisions of this article; shall investigate all essential statements and certificates by or on behalf of a member in connection with an application for disability retirement; and shall report in writing to the board of trustees its conclusions and recommendations upon all the matters referred to it." (emphasis added). As such, this Court does not consider this alleged violation of the Ethics in Government Law as a part of Stamps's cross-appeal.

¶38. However, even if this Court considered the alleged violation, the argument made in response is that member of the Medical Board are not government employees. They are contractors that render their expertise to PERS for a fee. The courts of this state have long

held that contractors are not employees. *Richardson v. APAC-Miss., Inc.*, 631 So. 2d 143 (Miss. 1994).

¶39. Further, the physicians who sit on the Medical Board are not "public servants," as alleged by Stamps. Stamps cites Miss. Code Ann. § 25-4-103(p), but upon a closer review, it is apparent that this section does not support her argument. A public servant is defined as one "who receives a salary, per diem or expenses" from state funds. § 25-4-103(p)(i)-(iii). The members of the Medical Board are not elected or appointed officials, and they are not employees of PERS. Moreover, the physicians are not paid a salary, but are instead, reimbursed a fee for each time he/she meets to review cases. Therefore, since Dr. Collipp is not a public servant, there is no violation of the Ethics in Government Law.

¶40. Likewise, the factual allegations made by Stamps are simply inaccurate. She states that Dr. Collipp referred her to the Mississippi Methodist Rehabilitation Center at One Layfair Drive, and that this is the same location of the clinic out of which Dr. Collipp practices medicine. A patient must be referred to the Methodist Rehabilitation Center-an individual cannot "walk in" and ask for an evaluation. The entire Medical Board requested the evaluation and Dr. Collipp was merely the referring physician. One Layfair Drive is comprised of a complex of buildings, and further, Dr. Collipp's office is not even in the same building where the FCE was performed.

¶41. Dr. Collipp's association with the Methodist Rehab Center involves the overseeing of the nursing staff on the 6th floor, in the orthopedic rehabilitation area, of the Woodrow Wilson location. The services he performs are totally disassociated with the evaluations that were done at One Layfair Square. Although no evidence is offered to support it, Stamps implies that

Dr. Collipp is utilizing his position with the Medical Board to induce a higher benefit for himself at Methodist Rehabilitation Services.

¶42.    Stamps also claims that a conflict of interest exists whereby Dr. Collipp has "the dual role of investigating the claim as a Medical Board member and as a Mississippi Methodist Rehab Clinic director ordering Stamps to undergo an FCE at the clinic down the hall where he is a director."   Again, this allegation is false.   As discussed previously, the locations were different, and Dr. Collipp did not order Stamps to undergo an FCE but rather the Medical Board deferred Stamps's case until she could have the Functional Capacity Evaluation.

### III.    Alternatively, should Stamps's case be reversed and remanded for a new hearing because the report of the Functional Capacity Examination was hearsay?

¶43.    In her brief, Stamps correctly states that the Rules of Hearing Practice and Procedure for PERS hearings provides that "formal rules of evidence shall not apply."   PERS Regulation 42.

¶44.    Stamps also contends, as she did in the proceedings below,  that the report of the FCE that she was ordered to undergo is a report of a procedure not performed or interpreted by a physician.   It was administered and written by Lisa Poe, who did not appear at the hearing for cross-examination as requested by Stamps.   However, since PERS does not have subpoena power for its administrative hearings, it can only request that a person appear.   Stamps is not entitled to a cross examination of Poe.

¶45.    Stamps further argues that according to *Georgia-Pacific Corp. v. McLaurin*, 370 So. 2d 1359 (Miss. 1979), this Court condemned the introduction of unsworn medical reports of physicians in workers' compensation cases.   However, in 1998, the Court of Appeals stated

19

that PERS' law is separate and distinct from workers' compensation law. ***Brinston v. Pub. Employees' Ret. Sys.***, 706 So. 2d 258, 260 (Miss. Ct. App. 1998). Therefore, a workers' compensation case should not be considered precedent for a PERS case. Moreover, to hold that Stamps's right to due process has been violated, in the manner described, would render every PERS hearing unconstitutional, as mentioned previously, because PERS does not have the power to subpoena witnesses. Similarly, it would also place a great burden on the claimants, as they would have to produce doctors, therapists, and any other person who produced a document the claimant introduces so that PERS would be able to cross-examine the named person.

¶46. Further, if the report of the therapist who conducted the FCE is hearsay, then the reports offered by Stamps are hearsay as well. This issue is without merit.

> **III. Alternatively, Should Stamps's Case Be Reversed and Remanded for a New Hearing and Miss. Code Ann. § 25-11-120 Declared Unconstitutional Because it Does Not Allow Claimants Such as Stamps to Take Depositions or Subpoena for Cross Examination of Individuals Such as the Author of the Functional Capacity Evaluation?**

¶47. Rule 5.03 of the Uniform Rules of Circuit and County Court Practice limits the scope of review by this Court on appeals such as this. As discussed previously, review is limited to a determination of whether the Board of Trustees' decision was: (1) supported by substantial evidence; or (2) was arbitrary or capricious; or (3) was beyond the authority of the Board to make; or (4) violated a statutory or constitutional right of Stamps. ***Dishmon***, 797 So. 2d at 891; ***Davis v. Pub. Employees' Ret. Sys.***, 750 So. 2d 1225, 1229 (Miss. 1999). ¶48.

Stamps suggests that the applicable PERS Rules of Hearing Practice and Procedure give

20

no discovery opportunities or the right to subpoena witnesses or documents. She argues that because of this, her due process rights were violated by the absence of the right to subpoena in the PERS Rules of Hearing Practice and Procedure. Stamps's argument is problematic because the Legislature did not provide statutory authority granting PERS subpoena power. Administrative bodies such as PERS "may not make rules and regulations which conflict with, or are contrary to, the provisions of a statute, particularly the statute it is administering or which created it." *Miss. Pub. Serv. Comm'n v. Miss. Power & Light Co.*, 593 So. 2d 997, 1000 (Miss. 1991).

¶49. Stamps cites a United States Supreme Court case that held that a claimant in disability cases had the absolute right to cross-examine a physician when a subpoena had been sought. *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1428, 1444, 28 L.Ed. 2d 842 (1971). However, this case also states that "a written report by a licensed physician who has examined the claimant and who sets forth in his report his medical findings in his area of competence may be received as evidence in a disability hearing and, despite its hearsay character and an absence of cross-examination may constitute substantial evidence supportive of a finding by the hearing examiner adverse to the claimant...." *Id.*

¶50. Again, cross-examination is not an absolute right in administrative cases. *Central Freight Lines, Inc. v. United States*, 669 F.2d 1063, 1068 (5th Cir. 1982). Administrative hearings are not trials and are thereby not governed by the same rules which are applicable to courts of law. *United Cement Co. v. Safe Air for the Environment, Inc.*, 558 So. 2d 840 (Miss. 1998). This issue is without merit.

**IV.** **Alternatively, Should Stamps's Case Be Reversed and Remanded for a New Hearing since Neither the Pers Medical Board or the Disability Appeals Committee Followed the Mississippi Open Meetings Law and since Parts of the Proceedings of the Pers Medical Board Were Withheld from Stamps?**

¶51. Stamps argues, as she argued in the proceedings below, that the hearing before the Disability Appeals Committee and the proceedings before the Medical Review Board violate the Open Meetings Law, Miss. Code Ann § § 25-41-1, et. seq. Stamps's claim is misplaced because the purpose of the hearing was to consider an appeal of a denial of a disability claim which was based on the documentation submitted and the testimony elicited. The review before the Medical Board was for the purpose of determining whether or not, based on the documentation, the claimant met the requirements for the receipt of a disability benefit. Neither the Medical Board nor the Disability Appeals Committee for PERS are subject to the Open Meetings Law of Mississippi. The applicable statute states ". . . the formation and determination of public policy is public business and shall be conducted at open meetings . . ." Miss. Code Ann. § 25-41-1 (Rev. 2003). According to this Court, "meetings" are defined as "[a]ll the deliberative stages of the decision-making process of the public body that lead to formation and determination of public policy are 'meetings' within the meaning of Section 25-41-7(4) which requires that all meetings of a public body be public except when in executive session." *Gannett River States Publ'g. Corp. v. City of Jackson*, 866 So. 2d 462, 469 (Miss. 2004). (citing *Bd. of Trustees of the State Institutions of Higher Learning v. Miss. Publishers Corp.*, 478 So. 2d 269, 278 (Miss. 1985)).

¶52. The Medical Board and the Disability Appeals Committee for PERS made no such formation or determination of public policy. The action of the Committee was to propose a

statement of facts, provide a conclusion of law, and present its recommendation to the Board of Trustees. These proposals and recommendations, based on the record, are purely advisory in nature, and the ultimate decision rests with the Board of Trustees.

¶53. Stamps also argues that substantial evidence exists of her condition not being disabling. She claims that this evidence is not contained in the PERS Disability Appeals Committee decision because the record fails to reflect if two of the members even participated in the decision of her case. Quite obviously, the decision was by a majority vote or otherwise, Stamps would not have been notified that her claim was denied.

¶54. Both the Medical Board and the Disability Appeals Committee conducted their inquiries according to PERS guidelines. This Court has previously ruled that ". . . the Commission [State Oil and Gas Board] is an administrative agency, not a court . . . It is a rare day when we will reverse the Commission for an action taken in the implementation and enforcement of its own procedural rules." *Delta Drilling Co. v. Cannette*, 489 So. 2d 1378, 1380-81 (Miss. 1986). Further, "Board rules must afford minimum procedural due process which is (1) notice, and (2) an opportunity to be heard." *State Oil & Gas Bd. v. McGowan*, 542 So. 2d 244, 248 (Miss. 1989). Clearly, Stamps was afforded due process required by law, and the proceedings were properly conducted according to state law. This issue is without merit.

     **V.**     **Alternatively, Should Stamps's Case Be Reversed and Remanded for a New Hearing since it Is a Conflict of Interest for an Attorney with the Attorney General's Office to Serve as a Member of the Disability Appeals Committee When the Attorney General Is the Statutory Legal Counsel to Pers?**

¶55.    Stamps claims that because Anita Clinton Craig was employed by the Attorney General of Mississippi as an attorney, and she was also a hearing officer for the Disability Appeals Committee, a conflict of interest was present.   In her brief, as well as in her argument presented in the proceedings below, Stamps states "[h]ere, the hearing officer Anita Clinton Craig solely authored a decision which affirmed the position of the agency, PERS, that her employer, the Attorney General of Mississippi, represents as statutory legal counsel."   She claims this is violative of a rule of law stated previously by this Court.   This Court has stated that "[a]dministrative proceedings should be conducted in a fair and impartial manner, free from any suspicion of prejudice or unfairness." *Dean v. Pub. Employees' Ret. Sys.*, 797 So. 2d 830, 837 (Miss. 2000) (citing *McFadden v. Miss. State Bd. of Med. Licensure*, 735 So. 2d.145, 158 (Miss. 1999)).   No evidence exists to substantiate Stamps's inference of having been afforded a hearing that was not conducted in a "fair and impartial manner, free from any suspicion of prejudice or unfairness." *Id.*

¶56.    The presumption exists that hearing officers act with fairness and honesty.  *Harrison County Sch. Bd. v. Morreale*, 538 So. 2d 1196, 1202 (Miss. 1989).   Furthermore, in order to overcome this presumption, there must be a showing of personal or financial interest on the part of the hearing officer, or evidence of misconduct.  *Dampier v. Lawrence County Sch. Dist.*, 344 So. 2d 130, 132-33 (Miss. 1977).   Stamps does not even attempt to address or overcome this presumption.   Even so, this Court has plainly ruled that administrative agencies are capable of performing multiple functions.   This Court has stated   "[t]his Court has rejected the proposition that administrative agencies cannot perform both investigative and adjudicative functions."    *Freeman,* 822 So. 2d at 281 (citing *McFadden v. Miss. Bd. of Med. Licensure*,

24

735 So. 2d at 158). "The combination in the same individual of ... nonadjudicative functions does not violate due process, provided the claimant's due process rights to a fair hearing before an impartial adjudicator are otherwise protected." *Id.* Again, there is no evidence to suggest that Ms. Craig was not impartial. This Court has also stated, in reference to an assistant attorney general being a hearing officer, "[t]hat office affords counsel to state agencies and we see no conflict or suggestion of unfairness in this arrangement." *United Cement Co.*, 558 So. 2d at 842 (citing *Frazier v. State ex rel. Pittman*, 504 So. 2d 675, 691 (Miss. 1987); *Miss. Pub. Serv. Comm'n*, 418 So. 2d at 784)). Therefore, Stamps's claim is without merit.

## CONCLUSION

¶57. The record clearly supports the decision entered by the PERS Board of Trustees, and their order is supported by substantial evidence. Stamps's claim for disability does not meet the requirements for the receipt of a disability benefit under the laws governing the administration of the Public Employees' Retirement System. The circuit court impermissibly reweighed the evidence in this matter and substituted its judgment for that of the Board of Trustees. Therefore, on direct appeal we reverse the judgment of the circuit court, and we render judgment reinstating the denial of disability benefits by the PERS Board of Trustees. We affirm on cross-appeal.

¶58. **ON DIRECT APPEAL: REVERSED AND RENDERED. ON CROSS-APPEAL: AFFIRMED.**

**WALLER AND COBB, P.JJ., CARLSON, DICKINSON AND RANDOLPH, JJ., CONCUR. EASLEY AND GRAVES, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING**.